May I please report? My name is Dana Taunton and I, along with my partner Mike Crowe, represent Bonnie Taylor. Bonnie Taylor is the father and personal representative of the estate of Amos Taylor. Amos Taylor died while in the custody of the defendant jailers in this case. in an overnight stay at the Covington County Jail. The continuous cries for medical help of a serious sick inmate cannot be ignored. And that's what we have here. The defendant jailers ignored his cries for help repeatedly throughout the night. The lower court erred in granting some re-judgment. In our case, we're asking for it to be reversed for two reasons. One, on the deliberate indifference claim, the lower court viewed the evidence that we presented and all the inferences that came from that evidence in a light most favorable to the defendants and not the plaintiff. Also, on the Alabama state law claims, the lower court erred in granting immunity to the defendant jailers. Can I ask a question just quickly about the state law immunity question? Are you pursuing what I'll call state agent immunity under Cranman or really just the statutory immunity under 14, what is it, 16 or whatever? Yes, I think that's an excellent question in light of I don't think our briefs were very clear on that point. Sovereign immunity is a much broader immunity allowed. The jailers are covered by 1461, which provides sovereign immunity for jailers. They are equated to the sheriffs. You really don't reach down after that sovereign immunity analysis to get to the state agency immunity. It's our position that it's a sovereign immunity analysis alone and it begins and not Cranman, just to help us kind of narrow the scope of the inquiry. Okay, good, thanks. Yes, and on that point, I would say that the only difference between the sheriff's immunity and the jailer's sovereign immunity is the one language in the statute that says in compliance with the law that jailers are not entitled to and there's really, as you all know, there's really been no direction from the Alabama Supreme Court on what that phrase means. Sounds like we've begged for it and they won't give it to us, right? Several times, several times, but I would say this, the lone dissenting opinion Justice Shaw in the Sawyer case did give us some insight as to what in compliance with the law means and in that sense he said that it would mean that violations of criminal or civil statutes or violations of constitutional precepts and in this case we have both for the jailers, which is why they're not entitled to sovereign immunity. We have the deliberate indifference claim which gets us past sovereign immunity and we have a violation of 14-6-19, failure to provide necessary medical treatment and medical attention to the defendant, I mean to the inmate. So as part your 14-6-1 argument also, I guess I had assumed it was, maybe it's not, that violation of the prison policies also takes you out of being in compliance with law or not so much? We're going to just talk about the statute really. For purpose of the bill, I think we would follow the reasoning in Young as well as in Hobbs. Young did say that to pull the policies up to the level of the law is not appropriate. So I would follow the reasoning in Hobbs and actually also in the McCall case where the violations of the medical statute enough was a violation of the law and you would get past sovereign immunity that way. But going back to our deliberate indifference standard, I want to talk to you all about the facts because I think that's where the lower court erred in drawing those inferences more favorable to the defendant jailer instead of to our client. Here the jailers were deliberately indifferent because there's substantial evidence that Thomas Taylor had an objective serious medical need that would have been obvious to any layperson and also that there was a delay by just delaying in treating his need, it worsened throughout the case. Additionally, I think there was substantial evidence that the defendant that the defendants had subjective knowledge of the risk of serious harm, which can be proved by circumstantial evidence or the fact that the risk is obvious. They disregarded that risk and it was by conduct that was... But they felt that he was just a drunk and just needed to dry out overnight. They didn't even know he had been really in an accident, did they? I think that's incorrect and here's the reason why. If you go through a timeline, he was brought into the jail at 930 by the trooper. At that point, the trooper tells Parker and Parker testifies to this that he had recently been in an accident. That's what he said he was and the trooper said he couldn't find any evidence of it. That he was drunk and that the medical people had been there and had ministered to him, but he rejected going to the hospital and signed a waiver. That is correct. Now that's what the intake people get from a highway patrolman. That is what Parker's testimony was. Yes, sir. Well, I mean, that's what the highway patrolman said. Well, the highway patrolman said he was a little unsure as to whether he said medically cleared, but he did say he was checked out by the EMS. Well, the nurse at the scene laid it all out in her testimony. The nurse who was with him, the two women that went, the emergency people, yes. Yes, sir. But that would not have been, it may have influenced the defendant jailers because they were- I understand that, but the highway patrolman saw all that. That may be correct, yes, sir. Okay. But for our purposes at 930, they were at least alerted. There was a known risk at that time that he could have been in an accident. And by 1127, two hours later, Hunter tells, Hunter goes into attempts to book Mr. Taylor, and Taylor tells him at that time, repeats that he's been in a wreck and that he's complaining of stomach pains and that he's all busted up inside. And that comes from the booking log, and that also comes from Defendant Blue's testimony that right after the booking, Hunter comes in and tells him that Taylor had been in a wreck and was complaining of stomach pains. Can you tell me just sort of on the ground how the booking log works? Like sort of who logs the information? I might have just forgotten this from my reading, but who logs the information and then who thereafter sees that? It appears from the evidence, it's almost like a tag team situation that may take turns or something. I know specifically for Almas Taylor, it was Parker that initially helped him bring him in as shown by the video, but Hunter then testifies two hours later that he was the one who went to try to book him. And I believe the booking must be the filling out of the forms and stuff. And listening to the highway patrolman. And taking the report from the highway patrolman. That would have been done by Parker when he initially came to the jail at 930. Yes, sir. Yes, sir. But the actual booking of the filling out the forms came two hours later when he, I think Hunter's described it as attempted booking. The jailers didn't know that he was in a sense dying of internal bleeding, did they? It is our position that from the inferences they did know. If you look at Michael Scott, the inmate's testimony in that regard, he said that the inmate, that Taylor, was crying for I apologize. Let me get my facts. And that he said he was dying and that he was complaining all night. And more specifically, inmate Taylor says that the jailers walked by the cell more than five or six times throughout the night and ignored his complaints and instead told Mr. Taylor to shut up and that he wouldn't get any help. Now that's testimony directly from Mr. Scott, the inmate. And he was booked at 130 in the morning. And if you look at the booking logs throughout the night with the inmates coming in and out, it's consistent with that. With the jailers being in and out walking by the holding cell all night because they all admit that the I think that was in Mr. Hunter's testimony, that Mr. Hunter testified we were in that the holding cell area all night because of the booking. What's your best case, do you think, analogous on the facts that would be supportive of your position? Well, the best case is a Fourth Circuit case because that involves specifically a liver laceration where the paramedics actually checked the fellow out before he was taken to jail and could not find the gunshot wound that caused it. But later at the jail, the inmates were complaining of him and other inmates were complaining that he was shot and he needed help and the jailers didn't get him help. So I think that's probably the most analogous, the Fourth Circuit case. But any case on medical delay, medical, denying medical attention, Goebert versus Lee County, I wanted to point this out because I think this is absolutely analogous. The court in Goebert says, choosing to deliberately disregard without investigation or inquiry, everything an inmate says amounts to willful blindness. And that's what we have. Throughout these complaints by the inmates, throughout Taylor's complaints, they ignored him. They never went into his jail until jail. I think the first time we have evidence that they may have went into the actual jail cell was at 5 o'clock. And so how do we weigh the 5 a.m. evidence where they say at 5 a.m., do you need medical help? And he says, no, no, no, that's all right. I can wait until the nurse gets here. Well, I think you have to weigh it in the context of the big picture because I would cast, I think the evidence of what was happening before and immediately after that cast a lot of doubt on whether Taylor would have said that to defendant Hunter. Because if you look at the descriptive language of the inmates, both before and after, and if you look at the nurse's own testimony, what they said, it just doesn't jive with what Hunter described. If somebody is begging for help, saying they are dying, pleading for medical help, and instead the officers are telling him to shut up and he's not getting any help, and then immediately afterwards, 522, he comes in at 5 o'clock, and then by 522, the inmate says Taylor's screaming for help, his chest was hurting, he was crying. Just so I'm clear, and I know your time is up, but so it's disputed that Taylor declined medical help at 5 a.m. and said, I can wait until the nurse gets here. That's a disputed fact. I would say that would be a disputed fact for the jury to decide based on the surrounding evidence. Yes, sir. Okay. And I just mean not from your representation here, but in the record, it's disputed. Well, it can't be disputed because the only people who heard that would have been at Hunter and Mr. Taylor, and Mr. Taylor's dead. So I can't really point to anything that disputes this. Okay. You've saved some rebuttal time. Yes, sir. Thank you. Mr. Clements. May it please the court, my name is Fred Clements, and I represent the Covington County Jailers. This court should affirm this record for two reasons. First, the plaintiffs failed to show that the jailers were either objectively or subjectively aware of Mr. Taylor's hidden injury. Second... So is that the right analysis? I mean, do you have to see sort of x-ray vision like through the prisoner's body to know what's going on inside? Do you have to know specifically the condition that is ailing this person on the inside? Or do you just have to have an objective and subjective awareness of a medical need generally? It has to be more than just some condition in that he was intoxicated, which... Or let's call it a serious medical need. I mean, do they have to know or should have known that he was suffering from internal bleeding? How would that... How would they ever know that? Well, that's the point exactly. How would a lay person ever know whether someone's internally bleeding? So basically, the sort of the jailers win in every case where there's an internal injury? Well, not necessarily, because if you find that jailers should have been aware of an injury is where they were present and observed some type of injury that occurred. The classic case is the case where an individual ended up being shot. Well, if there's blood and if there's visible signs of some kind of injury, well, then no. They would not have to be aware of the specific injury. So if a bullet wound lacerated a liver, they would not have to be aware that, well, the bullet wound could have lacerated the liver. Or instances where officers have been present and have used a certain amount of force on an individual. And in those situations, the courts have said, well, you can't really be surprised in using force that some type of injury might have occurred given these other circumstances. But so either the jailer has to be there at the infliction or to witness the injury occurring, or there has to be some external evidence of the injury. If the jailer is not there and there is only internal injury that is not visible to the naked eye, you win every time. Well, I don't know if every time, but the rule is that it has to be obvious to the lay person. Well, the question is, what do they know? The question is, what do they know? And what they know starts with the highway patrolman, doesn't it? Well, in this case, it does. Because the information of any potential injury that the officers may have known about, it was dependent upon that being communicated by the state trooper. And to address the assertion that Trooper Amos may have communicated that he had been in an accident, the record shows that could not have been the case. Trooper Amos specifically testified that when he investigated the scene, he did not believe there was an accident. What was it that he told Parker? That's the important thing. What did he tell Parker? He told him about two things. He told him about finding him, and then he also told him about the medical people, the EMS came. Yes, Your Honor, and I believe you're referring to what, if the video is actually Trooper Amos speaking to Officer Parker, his conversation with Officer Hunter wasn't... No, no, I understand that. He was talking to Parker when they were bringing him in. Yes, he told him he's been checked out by EMS, he's just intoxicated, and then he further communicates in the afternoon, if he's up in Perky, you can go ahead and release him, you don't need to call me or anything. This, the communication that Trooper Amos was giving to the officers was, this was just a standard run-of-the-mill DUI for which you can hold individuals up to 24 hours under Alabama law. Okay, but then after Amos was long gone, now it's in the middle of the night in the jail, and the testimony at least from the plaintiff, Taylor, is that he was saying he was dying, he was broken up inside, he was crying in pain, he was moaning, he was begging for medical attention, he was told by the guards to shut up. Now, assuming all the inferences and testimony has to be given in favor of the plaintiff here, you know, for the purpose of summary judgment and qualified immunity, why isn't that enough to show that it would be obvious to a layperson that they should have summoned some medical attention for this man? Well, if you look at the, first, if you look at the testimony of those particular inmates, you'll see that crying all night was a conclusion, a general conclusion that they made. And the appellants are asking, as they did the district court, to draw the inference that he cried all night. For example, inmate Scott, who they just discussed, who was in the jail five and a half hours before EMS came, he initially in his deposition did say, oh, yes, he cried all night. But later, upon being asked how many times, he stated he did not recall, but more than five or six times. He also admitted it may have been an hour before the first time he complained. These are contained in document 110-31, pages 13, 18 through 23, as well as pages 36, 1 through 11. Inmate Garner, who was supplied by affidavit, he made the same general statement, but paragraph eight of his affidavit, contained in document 128-13, stated, I would doze off and on through the night and early morning hours and be awakened by Mr. Taylor, asking for help on several occasions. Now, the record shows that inmate Garner was in there for perhaps two hours. So during those two hours, while he dozed on and off, he heard him cry out a few times. Now, at this point, we're awfully close to five o'clock when Officer Hunter went into the room. What about Walker? Ethan Walker describes Taylor as having screamed for hours. I mean, continuously. Nobody would help him. And I mean, he kept telling everybody and wouldn't nobody help him. How long was he in there? About an hour and a half. And so that would have the... You have to remember, at this time, Officer Hunter had gone in to take his booking photograph, which appears on there, had spoken to him, had asked the nurse if he could wait for an hour for the nurse. So they were actively in here. And I should point out something that didn't come out in the briefs that is also interesting about inmate Walker's testimony regarding what had been communicated. Now, according to Mr. Taylor, or excuse me, according to inmate Walker, he stated that he spoke with Taylor, or at least overheard Taylor, told him that the state trooper had cleared him for a wreck and that he had been cleared, but his chest was hurting him. But they said that he had been cleared, so he was fine. And this is in document number 110-32, page 37, lines 17 through 88, excuse me, 38, lines 5. And so here we have an inmate testifying to the fact that Taylor, shortly before he died, was saying that he had been medically cleared. And so if you look at the substance of these inmates' testimony, it does not support the inference that Mr. Taylor, although he may have cried out at certain times, sat and cried out for help the entire night. But you're, you know, we're not here to decide who should, who would ultimately believe, are we? No, Your Honor. But the district court was only required to draw reasonable inferences in favor of the non-moving party. The inference that Mr. Taylor cried out all night is not a reasonable inference. So on your timeline, Scott plus Walker plus Garner does not equal reasonable inference that he cried out for a long time. It supports the inference that he cried out at various times. You would support, Scott, that he's cried out for four, five, or six times. And another thing that we should take a look at regarding this as well is the nurse, the jail nurse who came in at around six o'clock. When she first heard, her testimony was when she first heard him crying out, the cries to her were, okay, this is someone who's intoxicated. He told, she told him, you know what, I'm going to come see you after pill call. And so here we have a medical professional who these cries in and of themselves initially didn't, she did not draw any inference that there could be, that there could have been some kind of accident or medical condition. But she probably didn't hear him earlier say he was dying or broken up inside, did she? No, Your Honor. But Officer Hunter immediately upon Nurse Reeves arriving at the jail, went to her and reported that he had stated, reported to her that he said he had been in an accident, but that he had been medically cleared. And so Officer Hunter, while recording that information at some point in the night, he did document and immediately report to the nurse when she arrived as he said he did. And so she was aware initially that he may have been involved in an accident. Why would the officers have allegedly told Mr. Taylor to shut up? It's hard to say, Your Honor. I can't, it's a bad fact. It's rude, it may be improper misconduct. But it isn't indicative of whether there were sufficient facts for the officers to understand. Well, they thought he was still drunk, I think, didn't they? Well, they understood that he was drunk. But not necessarily telling them to shut up, albeit certainly impolite, isn't anything that can indicate whether or not that he was bleeding internally. Well, it depends on what inference you draw from that. You could draw an inference that's negative to the jailers, that they didn't want to be bothered with him and were ignoring his serious medical need. Well, Your Honor, there would have had to have been sufficient facts available for them to have even drawn an inference that he had a serious medical need. That he had, that he was not only suffering from intoxication, but suffering from internal bleeding. Some kind of serious medical condition, right? Back to my question, I have this doubt, this lingering doubt, that they have to know specifically that he's suffering from internal bleeding. Surely, you can't say that they have to know the precise medical condition. No, Your Honor, and I'm not saying that they do have to know a specific injury. But when you have an injury such as internal bleeding that's hidden, they have to have some information that could indicate there was some injury other than he was intoxicated. This court's, the case in Finn, involving the man who was arrested with COPD who needed oxygen. You know, the officers arrested him. They put him in, you know, he was put in the jail cell. They didn't know he needed continuous oxygen and he died. In that case, they thought that he had been drinking due to the smell of alcohol. And what this court said is that given his intoxication and their lack of knowledge of this kind of condition, these officers could not have been said to have been deliberately indifferent. Can I ask you a quick, I'm sorry, Jerry, go ahead. What they knew was, as I see it, that he said he'd been in a wreck. The highway patrolman said he couldn't find evidence of the wreck, but at any rate, that he got banged up and that he was drunk. And had been cleared by the medical people at the scene. That's the stimulus. That's what the officer, the highway patrolman, told Parker and therefore to Hunter too, because Hunter knew the same thing. Yes, Your Honor. And then he said he was hurting. He'd been banged up in an accident. Yes. That's something substantive, isn't it? Well, yes. He's groaning a lot or crying, I'm hurting or whatever it is. But the information that he was communicating was, other than he was inebriated, was that he'd been in this wreck. Yes, Your Honor. Theoretically got banged around somehow. Well, that is one piece of information that they received from the inmate. And I don't know any other information they received other than groaning all night and crying. Well, they had received information from the arresting officer, who they knew, who they trusted, who they had no reason to doubt. I understand that. The arresting officer said I couldn't find evidence of a traffic accident. So, I mean, so may I clarify? So is Your Honor saying that it should have been enough? I'm not arguing with you. I'm saying my impression of the evidence is that the stimulus, what the information was that came into the jailers, was that he was drunk, out of control, couldn't drive or anything else, that the officer, that the medics had been there, and that they had examined him, and they asked, he didn't want to go to the hospital, so he signed off. And so he brought him in. And the reason he said he can leave tomorrow, in other words, he's charged with DUI. So the officer doesn't think he's in any serious condition. As far as I'm concerned, you don't have to call me, which means go forward with the prosecution, I suppose, for the DUI. Isn't that the gist of it? The highway patrolman is, in effect, saying, I don't need to be informed. If he sobers up and you can let him go. You're on my nickel. Isn't that the gist of it? I'm not arguing your case. I'm telling you what I see. Yes, you are. And I would say it is very akin to these qualified immunity cases where we talk about officers on the scene being entitled to qualified immunity because they are oftentimes faced with situations where they are not aware of all the facts. And in this case, the officers weren't aware of all the facts. And in case you could say that Trooper Amos, albeit unintentionally, misled them on the facts. Let me ask you one more, if you don't mind. I take it it's undisputed. Maybe it may not matter legally because they're not pressing the jail policy argument. But I take it it's undisputed that the jail policy that would ordinarily prevent these guys from allowing someone into the jail who was so visibly intoxicated that he couldn't walk under his own power. Right? There is a policy that says we don't let people in who are so drunk that they can't walk themselves in. And so somehow this guy got in, helped in, right? Yeah, the policy was that they did need to be medically cleared. And so that policy you acknowledge, I guess, was violated here. Albeit unintentionally, being as the information that they perceived gave them the belief that he had been medically cleared. And I guess the reason I ask is that sort of how might that way in the balance of what the officers reasonably could have assumed about his condition, if there is a policy that says we don't let crazy drunk people into our jail. We just don't do it. And maybe unintentionally he got into the jail here. But if these guys are operating under that policy, we live in a world in which we don't let incapacitatedly drunk people into the jail, then later during the middle of the night, when he's crying out, does that make it more or less reasonable that they should have assumed that he was just drunk? I'm sure I understand. You're asking based upon the policy that we don't let extremely drunk people in. Right. Should we later assume that this guy is just drunk? I mean, I guess I'm just thinking sort of historically, is this a policy that is violated? So systematically that we assume that when people are crying out in the middle of the night, they're just drunk. Unfortunately, it's not an uncommon occurrence in jails. And this got into the testimony that came in through experts more in the district court. But as you get individuals who are heavier drinkers, which this individual's liver proved him to be, to put it bluntly, what is stinking drunk for someone who drinks a lot is entirely different than someone who drinks moderately. So unfortunately, there's not a good measure of sobriety, which is why they want individuals. I think we have your case. The red light's on. Thank you. Thank you. I want to go back to Judge Newsom's initial question about whether you have to have knowledge of the specific injury. I think case law is clear that you do not. Also, Brooke talks about facts signaling injuries or serious harm. You do not have to know that this was a specific liver laceration in order to meet that objective test. You look at the outward factual situations and dying when he's hollering that he's dying and he's begging for medical help and that he's in pain. You can infer from that that he's in pain. And so I think you don't have to show the specific injury. Also, I want to make this point. He argued inferences from the evidence, from the same evidence. And we're arguing inferences from the same evidence. And that's the whole point here. At this stage, at the summary judgment stage, those inferences have to be taken in a light most favorable to Mr. Taylor, not to the defendants. And that's what we have here. They want to ignore everything that happened. They want this court to ignore everything that happened after he came in and talked with the troopers and then just ignore everything else. And that's not how the law works. What the evidence showed in this case was that his condition worsened throughout the night and they did nothing. I think there was a question about whether you had to have outward signs like bleeding or something like that. And the point here is they wouldn't know because they never walked into the jail and investigated. And they never walked into the jail to make any inquiry. And based on the fact that the defendant was saying, man, I'm busted up inside. I've got abdominal pain. All they would have had to do is just what the nurse did, lift up his shirt, and they would have saw the road rash and the bruising from the injuries. But they didn't do that. For five hours from 11.27 until 6.30, they ignored everything the inmate said happened. And they did it. The testimony about the five or six times, that was the number of times the jailers walked by his cell at night and heard those cries. That's what inmate Scott testified to. And that they told him in response to shut up. And then one final thing, talking about the intoxication. Well, the intoxication did not mask his pain and suffering. And if anything, the fact that he was that highly intoxicated, I want to go back real quickly, the policies and procedures, that was on the sovereign immunity issue. The violations of the policies and procedures can be evidence of deliberate indifference. I do want to make that point. But the intoxication didn't mask his pain, didn't mask his complaints, and they never made inquiry into it. I think we have your case. Thank you, Your Honor. The next case is Hunter v. Hale. The window of the courtroom is settled,  Mr. Morrell.